# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**KENNETH SCHMIDT,**
      **Plaintiff,**

  v.                                      Case No. 19-C-0209

**METALCRAFT OF MAYVILLE, INC.,**
      **Defendant.**

## DECISION AND ORDER

The plaintiff, Kenneth Schmidt, alleges that the defendant, Metalcraft of Mayville, Inc., violated the Americans with Disabilities Act ("ADA") when it rejected his applications for several job openings in August 2016 and January 2017. Before me now is Metalcraft's motion for summary judgment. *See* Fed. R. Civ. P. 56.

## I. BACKGROUND

The plaintiff has Type 2 diabetes. During the time period relevant to this case, he suffered from a serious diabetic ulcer on his left foot. The ulcer was an open wound on the bottom of his foot. Such ulcers are prone to infection, and if the infection is not stopped, it can spread up the leg and into the patient's bloodstream, which can lead to death. *See* Dep. of Dr. Jerome Buboltz at 13. To prevent this outcome, it is sometimes necessary to amputate the patient's foot. *Id.*

The plaintiff worked for Metalcraft between 2000 and 2014. Metalcraft specializes in the manufacture and assembly of products such as lawnmowers. During his tenure with the company, the plaintiff worked as a laborer in various aspects of the manufacturing and assembly process. He was afflicted with the ulcer during this time, and he occasionally took leaves of absence to obtain treatment. On July 7, 2014, the plaintiff's

doctor, Dr. Jerome Buboltz, completed a "fitness for duty" form that restricted him to seated work. Def. Prop. Finding of Fact ("PFOF") ¶ 28. Metalcraft continued to employ the plaintiff until August 14, 2014, when it determined that it had no work that he could perform with his medical restrictions. On January 21, 2016, the plaintiff filed a charge of disability discrimination relating to his termination. That charge was dismissed as untimely. The plaintiff does not challenge his 2014 termination in this lawsuit.

Following his termination, the plaintiff worked for a company called Green Valley Enterprises, where he worked as a general laborer doing work similar to his work at Metalcraft. Pl. PFOF ¶ 11–13. According to the plaintiff, his work at Green Valley required him to stand, walk, and generally move about. *Id.* ¶ 12. Between July 2016 and Winter 2017, the plaintiff performed his work at Green Valley using a Charcot Restrictive Orthotic Walker—known as a "CROW boot"—to protect his foot. The boot was designed to "offload" pressure from the plaintiff's foot so that he could use the foot without worsening the ulcer. Buboltz Dep. at 18.

On July 13, 2016, the plaintiff applied for an open position at Metalcraft. The job title was "production helper." According to the written job description, the job would be performed entirely while standing, involved regular walking around, and would require the employee to regularly lift, carry, push, and pull items. ECF No. 24-3 at p. 64 of 98. On his application form, the plaintiff identified himself as someone with a disability. Metalcraft did not consider the plaintiff for this position because, based on Dr. Buboltz's medical restrictions from July 2014, which Metalcraft still had on file, the plaintiff would not have been able to perform the essential functions of the job.

2

On August 5, 2016, Dr. Buboltz signed a new fitness-for-duty form. In this new form, Dr. Buboltz indicated that the plaintiff could stand, walk, and perform other physical tasks other than lifting for up to eight hours a day. *See* ECF No. 24-3 at p. 74 of 98. In an area of the form that asked, "may not perform any lifting/carrying," Dr. Buboltz answered "yes." *Id.* Dr. Buboltz also specified that the plaintiff was required to wear an orthotic boot to protect his foot while he worked. On August 8, 2016, Dr. Buboltz wrote a letter that stated as follows: "Ok to return to work on 8/8/2016 with only restriction of using Cam Walker Boot[1] for protecting the left foot and kneeling scooter." ECF No. 24-3 at p. 76 of 98. The plaintiff did not provide either the updated restrictions or the August 8 letter to Metalcraft, and Metalcraft did not inquire whether the plaintiff's restrictions had changed.

In approximately November 2016, the plaintiff began treatment with a new wound-care specialist, Dr. Rebecca Striet, who started him on hyperbaric treatments. The treatments required the plaintiff to be in a hyperbaric chamber for about two hours per day, every Monday through Friday, until he completed 40 treatments over the course of about two months. *See* Striet Dep. at 13, 14–15, 43. Dr. Striet testified that, because hyperbaric treatments are so time intensive, patients undergoing them usually do not work. *Id.* at 43. Dr. Striet testified that, for the hyperbaric treatments to be successful, the plaintiff needed to offload pressure from his foot by not walking on it. *Id.* at 15. She testified that she expected him to use a kneeling scooter for offloading while he was working. *Id.* at 16, 21.

---

[1] A Cam Walker Boot is a different style of orthotic than the CROW boot, and the Cam Walker Boot did not work as well as the CROW boot. *See* Buboltz Dep. at 97. The plaintiff was using a Cam Walker Boot before he received his CROW boot. *Id.* at 97–98.

3

In January 2017, shortly after he completed his hyperbaric treatments, the plaintiff submitted a second application to Metalcraft for an open production helper position, along with applications for two other open positions: robotic welder and assembler. The robotic welder and assembler positions required levels of physical activity—including standing, walking, and lifting—similar to the position of production helper. *See* ECF No. 24-3 at 67–72. On his application, the plaintiff identified himself as someone with a disability. However, he did not identify his medical restrictions or request a reasonable accommodation. Once again, Metalcraft refused to consider him for the positions because, based on the July 2014 restrictions, it believed he was limited to seated work. Metalcraft did not ask the plaintiff whether his restrictions had changed.

The hyperbaric and other treatments performed by Dr. Striet did not improve the plaintiff's condition. By the end of April 2017, the bones in the plaintiff's foot were infected, and his foot needed to be amputated. *See* Striet Dep. at 32–33. On May 24, 2017, an orthopedic surgeon amputated the plaintiff's leg below the knee. Def. PFOF ¶ 73.

On January 23, 2017, the plaintiff filed a charge of discrimination relating to Metalcraft's failure to consider him for the positions he applied for in August 2016 and January 2017. After receiving notice of his right to sue, the plaintiff commenced this action. He alleges that Metalcraft's refusal to consider him for the positions violated the ADA.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light

4

most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

Metalcraft moves for summary judgment on two grounds. First, it contends that the plaintiff's claim is barred by the statute of limitations. Here, Metalcraft notes that the charge of discrimination the plaintiff filed after he was terminated in 2014 was rejected as untimely and that the plaintiff did not commence this suit within ninety days after receiving notice of his right to sue relating to the 2014 termination. Second, Metalcraft argues that, even if the present suit is timely, the plaintiff's claim for disability discrimination cannot advance to trial because he has not produced evidence from which a reasonable jury could conclude that he was qualified to perform the jobs he applied for with or without reasonable accommodation.

**A.  Timeliness**

Metalcraft contends that the plaintiff's claims involving his employment applications in August 2016 and January 2017 are untimely because he did not file a charge of discrimination with the appropriate administrative agencies within 300 days of his termination in 2014. *See* 42 U.S.C. § 2000e-5(e)(1) (person must file charge of discrimination within 300 days of alleged unlawful employment practice). I disagree. The plaintiff is not challenging his 2014 termination or seeking damages for the period between his termination and when he would have started the positions for which he applied in August 2016 and January 2017. Instead, he alleges that Metalcraft's refusal to consider his applications for the open positions constituted fresh acts of discrimination. The plaintiff seeks damages caused by the failure to hire him for the open positions. He filed administrative charges within 300 days of when his applications were rejected, and

5

he timely commenced this suit after the administrative agencies provided notice of his right to sue. Thus, the plaintiff's claims are timely.

Metalcraft cites cases holding that a plaintiff cannot resurrect an untimely discrimination claim relating to a termination by asking for reinstatement and then filing a fresh claim when the employer refuses to reinstate. *See Kennedy v. Chem. Waste Mgmt., Inc.*, 79 F.3d 49, 51 (7th Cir. 1996); *Burnam v. Amoco Container Co.*, 755 F.2d 893, 894–95 (11th Cir. 1985). But these cases do not hold that a plaintiff can never challenge a failure to rehire when he did not timely challenge his initial termination. Such a rule would prevent a plaintiff whose initial termination was lawful from challenging fresh acts of discrimination that occurred when the plaintiff later filed an application for an open position. For example, in the present case, the plaintiff might have agreed that, given his condition in 2014, he could not have performed the essential functions of his job and that therefore Metalcraft lawfully terminated his employment. If he agreed, then of course he wouldn't have filed a timely charge of discrimination related to the termination. Under Metalcraft's view of the law, even if the plaintiff's condition later improved enough so that he could perform the essential functions of an open position, Metalcraft could unlawfully reject the plaintiff's application because of his disability, and the plaintiff could not file a claim under the ADA because he did not file a timely charge relating to the lawful termination.

Cases such as *Kennedy* and *Burnam* do not mandate such an absurd result. Instead, such cases hold only that the plaintiff cannot resuscitate a time-barred claim relating to a termination by reapplying when "it is plain that reapplication is not invited." *Kennedy*, 79 F.3d at 51. In the present case, Metalcraft was accepting applications for

the positions the plaintiff applied for, and the plaintiff submitted bona fide applications. The plaintiff alleges "a new and discrete act of discrimination in the refusal to rehire itself," *Burnam*, 755 F.2d at 894, and therefore his failure to timely challenge his prior termination does not prevent him from seeking relief now.

**B.    Qualified Individual**

Section 12112(a) of the ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prove a violation of § 12112(a), a plaintiff must show that: (1) he was disabled; (2) he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) he suffered an adverse employment action; and (4) the adverse action was caused by his disability. *See, e.g., Kurtzhals v. County of Dunn*, __ F.3d __, 2020 WL 4580550, *2 (7th Cir. 2020).

In the present case, the parties agree that the plaintiff was disabled at the time he applied for positions at Metalcraft. They also agree that Metalcraft's refusal to consider his applications was an adverse employment action. Further, the defendant admits that it did not consider the plaintiff's applications because of his disability.[2] Thus, the only question is whether the plaintiff was qualified to perform the essential functions of the positions he applied for with or without reasonable accommodation.

---

[2] Because Metalcraft admits that its decision was motivated by the plaintiff's disability, the plaintiff's arguments concerning pretext and Metalcraft's motives, *see* Br. in Opp. at 12–14, 18–21, are irrelevant.

7

At the outset, I note that this is not a reasonable accommodation case, in that the plaintiff does not allege that Metalcraft should have modified the positions he applied for or its workplace policies to enable him to perform the essential functions of the positions. Instead, he contends that he could perform all the essential functions of the positions without modification while wearing a CROW boot. Metalcraft does not contend that its policies would have prevented the plaintiff from wearing a CROW boot while he worked. Thus, the question is whether the plaintiff could have performed the essential functions of the positions he applied for while wearing a CROW boot.

Before going further, it is important to refine the question slightly. The parties seem to agree that the plaintiff was physically capable of performing the positions he applied for while wearing the CROW boot. Indeed, as far as the record reveals, the plaintiff's foot ulcer did not inherently prevent him from standing, walking, or lifting as much as he liked. However, standing, walking, and performing other tasks that involved putting pressure on the foot were not medically recommended. In order to prevent his foot ulcer from worsening, the plaintiff was required to "offload" pressure from his foot by wearing the CROW boot and employing other strategies, such as using a kneeling scooter. *See* Striet Dep. at 15. From some of the evidence in the record, it appears that the plaintiff may have been willing to work without offloading his foot as recommended by his doctors. However, I do not understand the plaintiff to be claiming that the ADA required Metalcraft to allow him to ignore his doctors' advice and perform work while not properly offloading his foot. Thus, in evaluating whether the record would allow a reasonable jury to conclude that the plaintiff could perform the essential functions of the positions he applied for, I focus on whether the plaintiff could perform those functions while offloading his foot as advised by

8

his doctors. The question is therefore whether the plaintiff could, consistently with his doctors' advice, perform the functions of the positions while wearing a CROW boot.

As noted, the plaintiff submitted applications in August 2016 and January 2017. In January 2017, the plaintiff applied for three positions: production helper, robotic welder, and assembler. Just before he submitted his applications, the plaintiff had completed over two months of daily treatments in a hyperbaric chamber under Dr. Striet's supervision. She testified that, at this point, it was imperative that the plaintiff offload his foot. Striet Dep. at 15. She advised him to use a kneeling scooter (also known as a kneeling walker or rolling walker) for this purpose. *Id.* at 16. As the name implies, a kneeling scooter is a device on wheels that the plaintiff would rest his knee on while standing or walking. The plaintiff would control the scooter by grabbing onto a handlebar with hand brakes. *See* Schmidt Dep. at 29–30. Dr. Striet told the plaintiff that he should work only if he could use his kneeling scooter while doing so. *Id.* at 21.

At Dr. Striet's deposition, Metalcraft's counsel showed her a video of its employees performing the jobs that the plaintiff had applied for and asked her whether he could do those jobs while using a kneeling scooter.[3] Dr. Striet testified that he could not do so efficiently or safely. *See* Striet Dep. at 22–30. During the same deposition, plaintiff's counsel asked Dr. Striet if she knew that the plaintiff had been walking around quite a bit in his CROW boot without using a kneeling scooter. *Id.* at 36. Dr. Striet replied that she had not known that and that, if she had, she would have told him to stop. *Id.* Thus, as far as Dt. Striet was concerned, the plaintiff could not safely perform the essential functions

---

[3] The plaintiff does not dispute that these videos accurately depict the essential functions of the positions. *See* Def. PFOF ¶ 53 & Pl.'s Response.

of any of the positions he applied for in January 2017 while using a CROW boot but not a kneeling scooter.

As for the August 2016 application for the production-helper position, the plaintiff was under Dr. Buboltz's care at the time he submitted it. At his deposition, Metalcraft's counsel showed Dr. Buboltz the same video that it showed to Dr. Striet and asked him whether the plaintiff could perform the jobs depicted. *See* Buboltz Dep. at 64–74. Dr. Buboltz testified that the plaintiff could not do any of the jobs depicted while using a kneeling scooter, including the production-helper position. *Id.* at 66:18–66:19 (assembler), 69:6–73:14 (robotic welder), 74:15–74:17 (production helper). When Dr. Buboltz was asked whether the plaintiff could have performed any of the three positions depicted in the videos at the time Dr. Buboltz was treating him, Dr. Buboltz answered, "No, not in staying in compliance with the kneeling scooter." *Id.* at 75:10–75:11. And Dr. Buboltz then confirmed that, at the time the plaintiff applied for the production-helper position, he needed to use the kneeling scooter while working. *Id.* at 75:12–75:15.

After giving these answers, Dr. Buboltz allowed that the plaintiff might have been able to do some of the tasks depicted in the videos while using a CROW boot alone. He noted that, in general, a CROW boot could be used for walking shorter distances in tight spaces (such as on Metalcraft's production floor) and that the kneeling scooter was needed for longer distances. *See* Buboltz Dep. at 75:15–75:22, 78:11–78:14. Dr. Buboltz indicated that the plaintiff could have done some of the stationary tasks depicted in the videos while using only the CROW boot. *Id.* at 79:12–79:25. However, none of the positions for which the plaintiff applied involved only stationary work or work in which the plaintiff would not be required to walk, lift, and perform other physical tasks on a regular

10

basis. *See* ECF No. 24-3 at 63–72 (written job descriptions). Moreover, even after allowing that the plaintiff could have done some work while using only the CROW boot, Dr. Buboltz testified that he would not have recommended that the plaintiff work in any of the three positions for eight hours a day while using only a CROW boot. Buboltz Dep. at 82:23–83:3.

The plaintiff has not submitted evidence indicating that he could have performed the essential functions of the positions while properly caring for his foot ulcer. He does not, for example, offer testimony from another medical expert or a vocational expert indicating that he could have safely performed the jobs while using a CROW boot but not a kneeling scooter. However, he argues that, for two reasons, a reasonable jury could still find in his favor.

First, the plaintiff points out that, between July 2016 and Winter 2017, he was performing functions at Green Valley Enterprises that were similar to the functions of the jobs he applied for at Metalcraft while using only a CROW boot. Schmidt Aff. ¶¶ 9–12. However, during this time period, the plaintiff's ulcer worsened to the point where, by Spring 2017, his foot needed to be amputated. *See* Buboltz Dep. at 81:23–82:9. Thus, from the fact that the plaintiff was physically able to perform duties similar to those he would have performed at Metalcraft without using a kneeling scooter, a jury could not reasonably infer that he could have done so without causing further harm to his ulcer. And again, I do not understand the plaintiff to be arguing that the ADA required Metalcraft to hire him so long as he was willing to risk further harm to himself.

Second, the plaintiff contends that, based on the fitness-for-duty form that Dr. Buboltz completed on August 5, 2016, the plaintiff was cleared to perform the essential

11

functions of the positions he applied for while using an orthotic boot. However, the form stated that the plaintiff could not do any lifting, and lifting was an essential function of each of the three positions he applied for. *See* ECF No. 24-3 at 63–72. But even putting this problem aside, the form would not allow a reasonable jury to find that the plaintiff could safely perform the jobs. At his deposition, Dr. Buboltz clarified that, when he eased the plaintiff's restrictions, he did so reluctantly and thought that it was not "in the best interest of his ulcer." Buboltz Dep. at 77:15–78:8. Dr. Buboltz reasoned that because the plaintiff was walking around a fair amount outside of work, then perhaps he could also do so while working. *Id.* But only three days after issuing the eased restrictions, Dr. Buboltz wrote a letter stating that the plaintiff could return to work provided that he use a Cam Walker Boot *and* a kneeling scooter. Def. PFOF ¶ 38 & ECF No. 24-3 at p. 76. Although a Cam boot is different from a CROW boot, the letter did not indicate that the plaintiff could work for eight hours a day while using a CROW boot alone. Further, as noted, once Dr. Buboltz saw video footage of the tasks the plaintiff would be required to perform, he made clear that the plaintiff's performing those jobs for eight hours a day while using only a CROW boot would have been against his recommendations. A jury considering this evidence could not reasonably conclude that the plaintiff could have performed the essential functions of the jobs he applied for while properly caring for his foot ulcer.

For these reasons, I conclude that the evidence in the record does not create a triable issue on whether the plaintiff was qualified to perform the jobs he applied for with or without reasonable accommodation. Metalcraft is entitled to summary judgment on his claims of disability discrimination.

12

One final matter. The plaintiff contends that Metalcraft failed to engage in the interactive process required by the ADA when it rejected his applications without asking him if his medical restrictions had changed since he was terminated in 2014. However, an employer's failure to engage in the interactive process is not an independent basis for liability under the ADA. *See Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 480 n.1 (7th Cir. 2017). A plaintiff must still show that he or she is a qualified individual with a disability. *See Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1059 n.1 (7th Cir. 2014). Here, because the plaintiff has not demonstrated the existence of a triable issue on whether he was a qualified individual, Metalcraft's alleged failure to engage in the interactive process is not actionable.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendant's motion for summary judgment (ECF No. 24) is **GRANTED**. The Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 3rd day of September, 2020.

s/Lynn Adelman
LYNN ADELMAN
United States District Judge
